**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION AT MEMPHIS**

---

**COREY EDINGBURGH, TYRONE FRANKLIN,**
**AND BRIAN MORTON,**

**Plaintiffs,**

**v.**

**CITY OF MILLINGTON, GARY GRAVES,**
**TIM RUSSELL, CHRIS STOKES,**
**AND BRYAN CHILDRESS,**

**Defendants.**

**Case No.**
**JURY DEMANDED**

---

**COMPLAINT FOR DAMAGES**

---

COMES NOW Plaintiffs, Corey Edingburgh, Tyrone Franklin, and Brian Morton (collectively referred to hereinafter as "Plaintiffs"), by and through undersigned counsel, Alan G. Crone and The Crone Law Firm, PLC, and for their Complaint against the City of Millington, Gary Graves, Tim Russell, Chris Stokes, and Bryan Childress (collectively referred to hereinafter as "Defendants"), states as follows:

## I. NATURE OF THE COMPLAINT

1. Plaintiffs bring this action for wrongful termination arising out of Defendants discrimination and retaliation based on their race in violation of 42 U.S.C. § 1981, and violations of the Tennessee Human Rights Act (Tenn. Code Ann. § 4-21-401 et seq.).

## II. THE PARTIES

2. Plaintiff, Corey Edingburgh ("Edingburgh"), is a United States citizen, currently residing at 3103 Woodland Crest Drive, Lakeland, Shelby County, Tennessee, and has resided in Tennessee at all pertinent times referenced herein.

3. Plaintiff, Tyrone Franklin ("Franklin"), is a United States citizen, currently residing at 1833 Dewars Cove North, Cordova, Shelby County, Tennessee, and has resided in Tennessee at all pertinent times referenced herein.

4. Plaintiff, Brian Morton ("Morton"), is a United States citizen, currently residing at 5546 Dedo Cove, Memphis, Shelby County, Tennessee, and has resided in Tennessee at all pertinent times referenced herein.

5. Defendant, City of Millington ("Millington"), is a municipal entity, located in Shelby County, Tennessee, recognized by the State of Tennessee as a properly organized and legal municipal entity under charter granted by the State of Tennessee which, among other things, operates a police department called the Millington Police Department (hereinafter referred to as "Millington" or "City of Millington"). The City of Millington may be served through the Office of the Mayor, Terry Jones, located at 7930 Nelson Road, Millington, Tennessee 38053.

6. Defendant, Gary Graves ("Graves"), is the Director of Public Safety and, as part of his duties, oversees the Millington Police Department. Graves may be served at 4836 Navy Road, Suite 1, Millington, Tennessee 38053.

7. Defendant Tim Russell ("Russell") was employed as a police officer with the City of Millington at all pertinent times referenced herein. Russell can be served personally at his residence at 86 David Cove, Drummonds, Tennessee 38023.

8. Defendant Chris Stokes ("Stokes") was employed as a police officer with the City of Millington at all pertinent times referenced herein. Stokes can be served personally at his residence at 6930 Cedar Ridge Road, Millington, Tennessee 38053.

9. Defendant, Bryan Childress ("Childress") was employed as a police officer with the City of Millington at all pertinent times referenced herein. Childress can be served personally at his residence at 130 Robin Street, Munford, Tennessee 38058.

## III. JURISDICTION

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the subject matter of these claims is governed by federal law.

11. This Court has supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same operative facts as Plaintiffs other claims and together form part of the same case or controversy.

12. This Court has personal jurisdiction over Defendants because at all times relevant to this lawsuit, the Defendants were within this Court's jurisdiction.

## IV. Venue

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c), because the facts and circumstances which give rise to the causes of action contained within this Complaint occurred in Millington, Shelby County, Tennessee, and because the Defendants may be found in this Judicial District.

## V. FACTUAL ALLEGATIONS

14. Plaintiffs incorporate by reference parts I–IV of this Complaint as though fully set forth herein.

Factual Allegations of Plaintiff Edingburgh

15. Plaintiff Corey Edingburgh ("Mr. Edingburgh"), an African American, began working for the City of Millington on or about October 17, 2016 as a patrol officer.

16. After a few years of hard work, Mr. Edingburgh was promoted to Detective on or about January 21, 2019.

17. Within a few months, Mr. Edingburgh realized he was the only black detective, and was making significantly less than his white counterparts. In fact, Mr. Edingburgh never received a raise with his promotion to detective, despite the white officers promoted receiving pay raises.

18. Despite being underpaid, Mr. Edingburgh was also required to work patrol on top of his detective duties, despite his white counterparts not being required to do so.

19. At some point in May of 2019, Mr. Edingburgh raised his concerns to Lieutenant Stokes regarding this unfair and discriminatory practice; Mr. Stokes did nothing to address Mr. Edingburgh's concerns.

20. Because this persisted, Mr. Edingburgh went to Inspector Fields and notified him of the unfair treatment and discriminatory practice, and the failure of Mr. Stokes to address his concerns.

21. Rather than correct any issues, Mr. Edingburgh was instead moved back to the role of a patrol officer, and his detective duties were removed.

22. On or about April 25, 2022, Mr. Edingburgh emailed about an open sergeant position, indicating he wanted to submit his name for consideration.

23. On or about November 15, 2022, Mr. Edingburgh was promoted to sergeant, and based on information and belief, the only person of color having received this rank in the last twenty years.

24. Within four months, Mr. Edingburgh discovered that he was being paid significantly less than the white sergeants that were promoted at the same time Mr. Edingburgh was promoted, despite having the same job and experience as his white counterparts and being promoted at the same time.

25. Mr. Edingburgh raised the issue of the difference in pay to Chief Stokes, and made it clear it was unfair and unjust that they would be paying the only black sergeant significantly less than the white sergeants.

26. Chief Stokes informed Mr. Edingburgh that they were working toward remedying the problem, but this remedy did not come until 2023.

27. Once Mr. Edingburgh was finally receiving the same pay his white counterparts were receiving in 2023, he was never compensated for the lost earnings from 2023; in fact, he was explicitly told that he would not receive any backpay.

28. On August 12, 2023 Mr. Edingburgh observed a blacked-out photo in the shape of a Ku Klux Klan silhouette within the roll call room; Mr. Edingburgh requested for the one who made the drawing confess, but no one stepped forward.

29. On October 11, 2023, during a mandatory supervisory meeting, Mr. Edingburgh spoke out about the City of Millington's discriminatory practices when it comes to hiring and promoting.

30. In this meeting, there were discussions of hiring from outside the agency for an open lieutenant position.

31. Mr. Edingburgh made it clear that they should hire someone like himself from within the agency that had time and experience working within the City of Millington, and pointed to the City of Millington's hiring policy which stated that anyone coming from outside the agency had to start as a patrol officer like any other new hire would.

32. Chief Stokes responded that he did not have the necessary experience, and dismissed the possibility of hiring Mr. Edingburgh for the position. Instead, Chief Stokes hired a white lieutenant for the position.

33. Despite this claim that he did not have the necessary experience, almost all white officers with leadership roles lacked necessary experience, but their experience level was never questioned by Chief Stokes.

34. Within his position, Mr. Edingburgh saw how other black officers were treated less favorably than their white counterparts.

35. Particularly, he witnessed one officer, Officer Burt, who complained about discriminatory treatment by his field officer, be terminated for allegedly not meeting standards of the field training, yet a white officer, Officer Dehority, also did not meet the standards but was allowed to take remedial training—something Officer Burt was not permitted to do.

36. In another instance, on or about March 31, 2024 Mr. Edingburgh disciplined a Hispanic officer, Officer Kenneth Arthur, with a written reprimand for his first at-fault accident. However, Chief Stokes escalated the disciplinary action to a 3-day suspension. This decision was outside of policy, and was directly discriminatory based on race, evinced by Chief Stokes himself committing an at-fault accident and receiving no suspension, and a white officer doing the same and only receiving a 1-day suspension.

37. Concerns were raised that this treatment by Chief Stokes was discriminatory in nature, because any other white officer that was in an at-fault accident received significantly less punishment than the non-white officers in similar circumstances.

38. At some point in May of 2024, Mr. Edingburgh was called into a meeting with Chief Graves and Lieutenant Hilman, where the two berated Mr. Edingburgh for speaking out during the previous meeting in November regarding the lieutenant position.

39. During this meeting, Lieutenant Hilman accused Mr. Edingburgh of being upset that she took the position he wanted to apply for, and that if he had any issues to say it to her face because she's "a straight shooter."

40. The demeanor of this meeting caused Mr. Edingburgh to fear for his safety and his position, as he had seen in the past what happened to officers who spoke out about the discriminatory practices of the City of Millington, and he felt that this was a threat towards him.

41. Less than a month later, on June 7, 2024, Mr. Edingburgh was terminated from his employment; his reason for termination was cited as an incident that occurred on or about September 30, 2023, almost a year prior.

42. On this particular instance in September, Mr. Edingburgh was dispatched to an arrest scene; as the Seargent on duty, he was required to answer the call.

43. When he arrived, Officer Foster and Officer Morton were on the scene; hours later, Mr. Edingburgh called Officer Foster to confirm that the suspects wallet was in Officer Foster's position.

44. Officer Foster confirmed that he had it, but was unsure what happened to it. After further review, it became clear that Officer Foster had lost the wallet after misplacing it on top of his squad car and leaving the scene to transport the suspect.

45. Mr. Edingburgh wrote Officer Foster up for losing the wallet, citing to duty performance.

46. Officer Foster, a white officer was never disciplined for the misconduct; in fact, he was allowed to leave the City of Millington with no disciplinary action and allowed to transfer to the Germantown Police Department.

47. Instead of disciplining the officer who lost the wallet, Mr. Edingburgh and Officer Morton were terminated; the only difference between them and Officer Foster being the color of their skin.

48. Mr. Edingburgh recalls another instance of one Officer Grayson losing a firearm of a suspect on or about January 24, 2023; this officer was white, and similar to Officer Foster, was not disciplined for losing the weapon.

49. With this particular instance, Officer Grayson's immediate supervisor, who was also white, was also not disciplined or terminated for his direct report losing evidence—in direct contrast to the treatment of Mr. Edingburgh and Officer Morton.

50. Between the months of September 2023 and June of 2024, Mr. Edingburgh received no warning or disciplinary action for the events that occurred on or about September 30, 2023.

51. Mr. Edingburgh was also never provided a hearing, appeal, or any chance to defend himself for the actions taken on or about September 30, 2023—something that was routinely offered to white officers in similar incidents.

52. Based on information and belief, Mr. Edingburgh's position was replaced by a white officer, Chad Cunningham; Mr. Cunningham was significantly less qualified, and based on information and belief was not even a sworn officer.

<u>Factual Allegations of Plaintiff Franklin</u>

53. Plaintiff Tyrone Franklin ("Mr. Franklin"), an African American, began working for the City of Millington on or about April 9, 2022 when he was fifty (50) years old.

54. Mr. Franklin's interview went well, and during the interview Chief Stokes made it clear that he wanted community and police relations to increase.

55. Mr. Franklin received a take home police car as promised in 2022, but by early 2023 his take home vehicle was taken back by the City of Millington with no justifiable reason.

56. After some time, the white officers who lived inside and outside of city limits were provided their take-home vehicles back, but Mr. Franklin was not provided his back.

57. Over the course of his employment, Mr. Franklin received, with the exception of one negative report detailed below, numerous positive Observed Behavior Reports ("OBR") from members of the community.

58. This was largely in part because of Mr. Franklin's dedication to improve community and police relations, and in part by his deeply held beliefs to treat others with respect.

59. On or about April 11, 2023, Mr. Franklin participated with other officers in community outreach at the Tennessee Babtist Children's Home Ranch ("the Ranch").

60. During the community outreach, Mr. Franklin worked with fellow officers to assist at risk youth with daily chores; after the event, Mr. Franklin and his fellow officers were invited to return in the future.

61. On or about April 13, 2023, a false report was used as the basis of a negative OBR against Mr. Franklin.

62. The alleged report stated that the manager of the Ranch called Lieutenant Childress and told him that Mr. Franklin and other officers were making TikTok videos at the Ranch, showing the officers in an unprofessional manner and placing the children in the videos at risk.

63. In fact, no TikTok videos were ever made at the ranch by Mr. Franklin or any fellow officers, and the facts of the negative OBR were false and fabricated, upon information and belief, by Lieutenant Brian Childress.

64. Upon information and belief, Mr. Childress fabricated this story due to his disdain of Mr. Franklin and in a blatant attempt to lay the foundation to terminate Mr. Franklin, for no other reason than the color of his skin.

65. At some point after the OBR, Mr. Jeffrey Epps, the Vice President of the Ranch sent a letter to the City of Millington clarifying that no TikTok videos were taken, and that no one from the Ranch contacted Mr. Childress to submit any kind of complaint of the officers on April 11, and specifically not against Mr. Franklin. This letter furthers the belief that such a story was fabricated by Mr. Childress.

66. Multiple officers also spoke out about the severity of falsifying such a report in an intentional attempt to cause disciplinary action, and called for the administration to discipline Mr. Childress for his actions—and outlined the specific policy violations that Mr. Childress committed in falsifying a report—yet nothing was ever done.

67. Instead, the negative OBR was allowed to stay on all officers' records and employee file.

68. Interestingly, this was not Mr. Childress' first instance of fabricating information and violating ethics and policy.

69. In fact, Mr. Childress was previously terminated in 2012 from Tipton County Sheriff's Office for violating the Standard of Ethics and Rules of Conduct for failing to meet standards of work, morally and ethically; and for incompetence, inefficiency, or negligence in performing his duties.

70. Not long after speaking out, Mr. Franklin and his fellow officers who spoke out about the violations began to be retaliated against.

71. One of the officers that reported Mr. Childress' misconduct, Officer Niko Lewis, was ultimately terminated shortly after.

72. Not long after Officer Lewis's termination, Mr. Franklin observed a photo of Officer Lewis blacked out in the shape of a Ku Klux Klan silhouette, and observed numerous white officers laughing and mocking the photo.

73. At some point in 2023, Mr. Franklin was nominated for officer of the year, as he was in 2022; however, a less qualified white officer was selected for this position, despite achieving far less.

74. On or about November 15, 2023, Mr. Franklin was overlooked for Field Training Officer ("FTO") school, despite being a FTO and a senior officer of the Department; instead, the City of Millington sent only white officers to FTO school.

75. Mr. Franklin then notified the City of Millington to find another officer to do upcoming FTO training that he was assigned to do, because it was unfair for them to overlook him for schooling but still expect him to continue training.

76. In January of 2024, Mr. Franklin won Millington's Man of the Year; Chick-Fil-A's Officer of the Year; and Millington Police Department's Peoples Choice Officer of the Year awards, and was featured in the local newspaper.

77. On or about January 31, 2024, Mr. Franklin observed the newspaper clipping he was featured in cut-up aggressively on the squad room table, with his picture also cut out of the clipping; Mr. Franklin observed several white officers making negative statements about his awards, and claiming that his accomplishments were a joke.

78. These comments, coupled with the aggressiveness of the treatment of the newspaper article, made Mr. Franklin reasonably fearful for his safety with the City of Millington.

79. On or about June 11, 2024, an email was sent around to upper management at the City of Millington requesting nominations for the Officer of the Year award.

80. Seargent Booker immediately emailed Chief Stokes and Mr. Graves, nominating Mr. Franklin for the work he had done for the City of Millington and highlighting that he has never been fairly recognized.

81. Chief Stokes responded stating that the email was not a letter recognition, and advised they had instead went—again—with a less qualified, white officer for the award.

82. On or about June 13, 2024 Mr. Childress requested for Seargent Booker to design a flyer for an upcoming event with the officers and community; she submitted a flyer with a picture of Mr. Franklin on it, and was instructed that the flyer would work, but to remove Mr. Franklin's photo.

83. On or about June 13, 2024, it was announced that there would be new shifts with two (2) white officers being promoted to Seargent.

84. These two (2) white officers were less experienced and qualified than Mr. Franklin, and started significantly after Mr. Franklin, yet Mr. Franklin was never considered for either position.

85. On or about June 25, 2024, a new list for vehicle assignments was published; the white officers received new vehicles, whereas Mr. Franklin—an African American officer with seniority among his fellow officers—was provided a high-mileage patrol car.

86. On or about July 1, 2024, Mr. Franklin was required to leave the City of Millington on FMLA leave due to the increased level of stress and anxiety he was facing from the behavior and discrimination of the City of Millington.

87. On or about June 27, 2024, Mr. Franklin filed an inquiry with the EEOC regarding the discrimination and retaliation he felt was at play.

88. On or about September 22, 2024, Mr. Franklin submitted his resignation to the City of Millington due to the fear of returning to a hostile and discriminatory workplace.

Factual Allegations of Plaintiff Morton

89. Plaintiff Brian Morton ("Mr. Morton"), an African American, began working for the City of Millington on or about December 22, 2022.

90. Mr. Morton was hired with at least (2) other white officers—Bobby Barham and Thomas Grayson—who, based on information and belief, were started at higher pay rates than Mr. Morton.

91. Mr. Morton was trained by Officer Mathew Jones, who was not a certified trainer or field training officer, and was not capable of qualifying anyone in any training courses.

92. Mr. Morton learned of this deficiency of Officer Jones, and was worried that he would not meet the Tennessee Post's standards required of police officers due to the way the City of Millington Conducted their training.

93. Mr. Morton reported this issue to Mr. Childress, and nothing was done about this issue; in fact, Mr. Childress would often come back at the end of the training sessions to sign-off as if he had taught the course.

94. Based on the advertisement flyer that Mr. Morton received before joining the City of Millington, he was expected to receive a take-home vehicle after he completed his probationary period.

95. Mr. Morton completed his probationary period on or about June 22, 2023, but never received a take-home vehicle, despite his white counterparts receiving take-home vehicles.

96. Mr. Morton also observed that the squad cars he and other African American officers received where old, damaged, and nasty, while the white officers received the new squad cars.

97. Mr. Morton reported his concerns to the administration, and rather than answer his concerns, the City of Millington amended their policy to state that only officers who reside within the city limits can receive take-home vehicles.

98. Interestingly, only the white officers were those that were located within city limits.

99. Despite this policy, the City of Millington allowed a white officer, Mr. Tim Russell, a take-home vehicle, even though he resided outside of city limits.

100. After completing his probationary period, Mr. Morton, a certified instructor, noticed that no instructors were African American.

101. At some point in July of 2023 Mr. Morton reached out to Lieutenant Childress and requested to teach some courses, but Mr. Childress only hired his white friends as instructors of courses, regardless of whether they are certified to teach courses or not.

102. Specifically, Mr. Childress hired Chad Cunningham—a white friend of his—directly as a detective, despite a policy requirement for new officers to start as patrol officers and work their way up the chain of command.

103. Mr. Childress also hired Mr. Cunningham to teach courses he was not certified to teach, including taser training classes.

104. Mr. Childress also had officer Mathew Jones teach classes he was not certified to teach, including classes on domestic battery, range safety, and range qualifications.

105. Mr. Childress would simply falsify the documents to state that he was the one teaching the courses, despite these unqualified and uncertified officers being the actual ones teaching the courses.

106. Mr. Morton also began to notice discrepancies in the way white officers and black officers were treated.

107. Particularly, Mr. Morton would be written up for being late or not completing a report, while his white counterparts were not written up or disciplined for committing similar infractions.

108. On or about June 30, 2023, Chief Graves informed the officers of mandatory traffic work that would be required of them, and threatened the black officers of being written up if they did not appear, however, he did not offer the same threat to the white officers.

109. In fact, multiple white officers, including Officer Barrom, Officer Dehority, Seargent Suzore, and Officer Atkins, did not show up, and upon information and belief, were not disciplined.

110. On or about January 24, 2023, a white officer, Thomas Gracen, lost a suspect's gun during an investigation; upon information and belief, Mr. Gracen was never disciplined.

111. On or about August 12, 2023, Mr. Morton observed a photo on the bulletin board of a group of officers, with one of the black officers blackened out in what appears to be a Ku Klux Klan silhouette.

112. The white officers laughed and made jokes about the image, while Mr. Morton saw the action as an act of hate and began to fear for his safety within the force.

113. On or about September 30, 2023, Mr. Morton appeared on the scene to assist Officer Z. Foster, another white officer, with an arrest; during the course of this encounter, Mr. Foster placed the suspect's wallet on the top of his patrol car and drove off, losing the wallet. Officer Foster was never disciplined for this error, and instead, Mr. Morton was ultimately terminated for the white officer's mistake.

114. On or about February 20, 2024, the City of Millington began attempting to change shifts without discussing the same with the officers.

115. Mr. Morton's schedule was changed, and he spoke with his supervisor, Ms. Booker, regarding this, who stated that her schedule was also changed, but due to family scheduling issues she was allowed to remain in the same position.

116. Mr. Morton attempted to inform Chief Stokes that he would not be able to change shifts because of pick-up and drop-off times for his child; however, Mr. Morton received completely different treatment than Ms. Booker, a white female.

117. Chief Stokes required Mr. Morton to bring his custody court records to him for approval, informed him he needed to change his pick-up and drop-off times, and even went as far as attempting to call the judge who presided over Mr. Morton's custody case; in contrast, Ms. Booker was not required to provide any confidential information, and was not harassed at any level near what Mr. Morton was subjected to.

118. From that point forward, Mr. Morton was even more disparately treated than his white counterparts.

119. For instance, Mr. Morton requested additional specialized training that his white counterparts were permitted to have, but he was instructed that 'because he didn't work day shifts' he was not allowed to receive additional training; his white counterparts were permitted to receive additional training, regardless of their shift, but he was prevented from doing so.

120. Mr. Morton also observed that Chief Stokes would follow around predominantly African American shifts, but not the shifts that were predominantly Caucasian officers.

121. On or about May 3, 2024, Mr. Morton arrived to turn his keys over to Mr. Cunningham, who is good friends with Chief Stokes and Mr. Childress; during what should have

been a normal encounter, Mr. Cunningham began berating Mr. Morton, cussing him out, and threatening his job.

122. Mr. Morton reported this to Mr. Russell, who took no action because, upon information and belief, Mr. Cunningham was a fellow white officer.

123. Mr. Morton then reported the incident to Lieutenant Hillman, who informed him to write a statement, but still did nothing about the issue.

124. Mr. Morton has also seen evidence of Mr. Russell exhibiting racially motivated behavior, including instances where Mr. Russell has instructed Mr. Morton to not provide Narcan to black suspects, but would insist on it for white suspects.

125. To further evidence such behavior, on or about January 20, 2024, Mr. Russell was training another officer during a traffic stop of a black male; the officers called for a back-up unit, and Mr. Morton answered the call.

126. Mr. Morton arrived at the scene and observed Mr. Russell—as he had done to other black suspects in the past—cussing the suspect out while he was in handcuffs on the ground, calling him a "piece of shit," and informing Mr. Morton not to assist him in sitting up.

127. When Mr. Morton did allow the suspect to sit up from laying on the ground, he was berated and cussed out by Mr. Russell.

128. Mr. Morton made Mr. Childress aware of the way in which Mr. Russell spoke to him, but again, nothing was done about his complaints.

129. On June 7, 2024, less than one month later, Mr. Morton was terminated for "violations of department policy" for the incident that occurred on or about September 30, 2023 when the white officer misplaced a suspect's wallet.

130. The violations cited to were those surrounding body cameras and evidence preservation—all of which Mr. Morton was trained for by unqualified and uncertified white officers.

131. Mr. Morton had also made multiple reports during the months of July – November of issues with his body camera, but the issues were never resolved—despite when white officers made similar complaints of similar issues and their issues resolved almost immediately; it was not until February or March of 2024 when Mr. Morton's body camera issue was resolved.

132. Despite the evidence being lost by a white officer—who was never disciplined and instead allowed to change departments—Mr. Morton, a black officer, was the one ultimately terminated for the officer's mistake.

133. Mr. Morton was not provided the opportunity to resign rather than be terminated, something that his white counterparts were almost always allowed to do, evinced by a white officer's recent departure from the City of Millington, Mr. Michael Orick.

134. After his termination, Mr. Morton began attempting to apply at other departments, but has been prevented from obtaining alternate employment due to the intentional and retaliatory actions of the Defendants.

135. Particularly, on or about June 28, 2024, Mr. Morton was informed by Piperton Police Department that the Defendants had called and stated that Mr. Morton had stole money from the City of Millington and that he was a horrible officer.

136. On or about June 29, 2024, Mr. Morton was informed by the Oakland Police Department that Mr. Russell and Mr. Childress had called and informed them that Mr. Morton had stole money and that they were decertifying him.

137. On or about June 20, 2024 the Moscow Police Department informed Mr. Morton that Mr. Childress and Mr. Stokes had called and advised that Mr. Morton was a horrible officer and should not be an officer.

138. On or about September 19, 2024, Mr. Morton's boss was at a chief's conference in Tennessee, where he ran into Mr. Stokes; Mr. Stokes advised Mr. Morton's boss that he shouldn't hire him because he's a horrible employee, and invited Mr. Morton's boss to come inspect his employee file to see all of the write-ups for insubordination—which do not exist.

139. Based on information and belief, Defendant Stokes further retaliated by informing Mr. Morton's current chief on or about October 16, 2024 that he had sent paperwork to Piece Officer Standards and Training to de-certify Mr. Morton, which was confirmed later by Mr. Morton's current chief as being false.

140. Based on information and belief, Mr. Morton's position was replaced by a white officer.

## COUNT I – RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

141. Plaintiffs incorporate by reference parts I–V of this Complaint as though fully set forth herein.

142. All Plaintiffs belong to a racial minority class, as all Plaintiffs are African-American men.

143. Defendants intentionally discriminated against Plaintiff Morton when they: hired him at a lower rate than his white counterparts; did not provide him a take-home squad car when such was provided to his white counterparts; provided him inferior equipment and vehicles than his white counterparts; overlooked him for an instructor position and instead hired a less qualified white officer; wrote him up for violations that white officers were not written up for; subjected

him to different standards than white officers when attempting to switch his shifts; withheld additional training from him when it was provided to his white counterparts; and when they terminated him for the mistake of another white officer.

144. Defendants intentionally discriminated against Plaintiff Edingburgh when they: paid him less in his detective position than his white counterparts; assigned him duties as a detective that were not assigned to his white counterparts; paid him less than his white counterparts and failed to pay him backpay; overlooked him for the position of lieutenant and instead hired a less qualified white individual; terminated him for a mistake of another white officer; and denied him a hearing or appeal, something that was routinely provided to his white counterparts.

145. Defendants intentionally discriminated against Plaintiff Franklin when they: took away his take home vehicle, but did not do so for his white counterparts; falsified reports to provide him with a negative Observed Behavior Report; overlooked him for awards in favor of his white counterparts; overlooked him for additional training in favor of his white counterparts; overlooked him for promotions over his white counterparts; and provided him with inferior equipment and vehicles in favor of his white counterparts.

146. All of these described intentional discriminatory behaviors of Defendants would not have occurred but-for Plaintiffs race.

147. As described in detail above, Defendants treated white officers drastically different than Plaintiffs.

148. The discrimination of Defendants abridged Plaintiffs rights to make and enforce contracts, and abridged their right to the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship that their white counterparts were provided.

149. As such, Plaintiffs were significantly injured due to loss of pay and benefits, loss of opportunities, loss of employment and future employment opportunities, emotional pain and suffering, mental anguish, humiliation, and irreparable loss of enjoyment of life.

150. Plaintiffs have been further injured by incurring reasonable attorneys' fees and costs to pursue litigation.

## COUNT II – RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

151. Plaintiffs incorporate by reference parts I–V of this Complaint as though fully set forth herein.

152. All Plaintiffs belong to a racial minority class, as all Plaintiffs are African-American men.

153. Defendants intentionally retaliated against Plaintiff Edingburgh based on his race when he raised issues regarding his additional duties that were not required of his white counterparts, and when he spoke out regarding Defendants discriminatory and retaliatory practices regarding their hiring and firing processes.

154. Defendants intentionally retaliated against Plaintiff Franklin when he spoke out regarding falsifying reports in order to provide him with a negative Observed Behavior Report.

155. Defendants retaliated against Plaintiff Morton by lying and defaming his character, by calling departments he applied for and claiming that Plaintiff Morton stole money, was a horrible officer, was getting decertified, and claiming his file was full of write-ups for being insubordinate, and by making misrepresentations that they were de-certifying Plaintiff Morton.

156. Defendants did not retaliate and further discriminate against white officers who behaved similarly.

157. The retaliation abridged Plaintiffs rights to make and enforce contracts, and abridged their right to the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship that their white counterparts were provided.

158. As such, Plaintiffs were significantly injured due to loss of pay and benefits, loss of opportunities, loss of employment and future employment opportunities, emotional pain and suffering, mental anguish, humiliation, and irreparable loss of enjoyment of life.

159. Plaintiffs have been further injured by incurring reasonable attorneys' fees and costs to pursue litigation.

## COUNT III – VIOLATIONS OF T.C.A. §§ 4-21-101 *et seq.*

160. Plaintiffs incorporate by reference parts I-V of this Complaint as though fully set forth herein.

161. All Plaintiffs belong to a racial minority class, as all Plaintiffs are African-American men.

162. All Plaintiffs were qualified for their positions.

163. Defendants intentionally discriminated against Plaintiff Morton and subjected him to adverse treatment compared to his white counterparts when they: hired him at a lower rate than his white counterparts; did not provide him a take-home squad car when such was provided to his white counterparts; provided him inferior equipment and vehicles than his white counterparts; overlooked him for an instructor position and instead hired a less qualified white officer; wrote him up for violations that white officers were not written up for; subjected him to different standards than white officers when attempting to switch his shifts; withheld additional training from him when it was provided to his white counterparts; and when they terminated him for the mistake of another white officer.

164. Defendants intentionally discriminated against Plaintiff Edingburgh and subjected him to adverse treatment compared to his white counterparts when they: paid him less in his detective position than his white counterparts; assigned him duties as a detective that were not assigned to his white counterparts; paid him less as a sergeant than his white counterparts and failed to pay him backpay; overlooked him for the position of lieutenant and instead hired a less qualified white individual; terminated him for a mistake of another white officer; and denied him a hearing or appeal, something that was routinely provided to his white counterparts.

165. Defendants intentionally discriminated against Plaintiff Franklin and subjected him to adverse treatment compared to his white counterparts when they: took away his take home vehicle, but did not do so for his white counterparts; falsified reports to provide him with a negative Observed Behavior Report; overlooked him for awards in favor of his white counterparts; overlooked him for additional training in favor of his white counterparts; overlooked him for promotions over his white counterparts; and provided him with inferior equipment and vehicles in favor of his white counterparts.

166. All of these described intentional discriminatory behaviors of Defendants would not have occurred but-for Plaintiffs race.

167. As described in detail above, Defendants treated white officers drastically different than Plaintiffs.

168. The discrimination of Defendants and the disparate treatment of Plaintiffs caused Plaintiffs injury for Defendants willful violations of the Tennessee Human Rights Act.

169. Plaintiffs were significantly injured due to loss of pay and benefits, loss of opportunities, loss of employment and future employment opportunities, emotional pain and suffering, mental anguish, humiliation, and irreparable loss of enjoyment of life.

170. Plaintiffs have been further injured by incurring reasonable attorneys' fees and costs to pursue litigation.

171. Defendants intentionally retaliated against Plaintiff Edingburgh based on his race when he raised issues regarding his additional duties that were not required of his white counterparts, and when he spoke out regarding Defendants discriminatory and retaliatory practices regarding their hiring and firing processes.

172. Defendants intentionally retaliated against Plaintiff Franklin when he spoke out regarding falsifying reports in order to provide him with a negative Observed Behavior Report.

173. Defendants retaliated against Plaintiff Morton by lying and defaming his character, by calling departments he applied for and claiming that Plaintiff Morton stole money, was a horrible officer, was getting decertified, and claiming his file was full of write-ups for being insubordinate, and by making misrepresentations that they were de-certifying Plaintiff Morton.

174. Defendants did not retaliate and further discriminate against white officers who behaved similarly.

175. The retaliation cause Plaintiffs to suffer injury for Defendants willful violations of the Tennessee Human Rights Act.

176. As such, Plaintiffs were significantly injured due to loss of pay and benefits, loss of opportunities, loss of employment and future employment opportunities, emotional pain and suffering, mental anguish, humiliation, and irreparable loss of enjoyment of life.

177. Plaintiffs have been further injured by incurring reasonable attorneys' fees and costs to pursue litigation.

## COUNT IV – DEFAMATION

178. Plaintiffs incorporate by reference parts I–V of this Complaint as though fully set forth herein.

179. Defendants Russell, Stokes, and Childress, in their official and individual capacities, published statements, either in writing or verbally, on June 20, June 28, June 29, and September 19, 2024 claiming that Plaintiff Morton was a horrible officer, stole money from Defendants, they were decertifying Plaintiff Morton, and that his employee file is full of write-ups of insubordination.

180. Defendant Stokes also made claims on or about October 16, 2024 that he had sent in paperwork to Peace Officer Standards and Training to de-certify Plaintiff Morton, which was discovered to be false.

181. Defendants Russell, Stokes, and Childress knew that the statements regarding Plaintiff Morton were false.

182. Defendants Russell, Stokes, and Childress made the defamatory statements with the intent to harm the reputation of Plaintiff and with the intent to interfere with future employment opportunities.

183. As a result of Defendants Russell, Stokes, and Childress defamatory statements, Plaintiff Morton has been harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant them relief as follows:

1. Enter a declaratory judgment finding that the actions of the Defendants as alleged in this Complaint violated 42 U.S.C. § 1981;

2. Enter a permanent injunction barring Defendants from continuing to engage in illegal discriminatory conduct against other African Americans who may seek employment with Defendants;

3. Award compensatory damages in an amount no less than $1,000,000 for each Plaintiff or other amount that would fully compensate Plaintiffs for their damages, including but not limited to their loss of pay and benefits, loss of opportunities, loss of employment and future employment opportunities, emotional pain and suffering, mental anguish, humiliation, and irreparable loss of enjoyment of life caused by Defendants' violations of the law;

4. Award punitive damages to Plaintiffs in an amount sufficient to punish Defendants for the intentional, malicious, callous, bad faith, willful, wanton, and reckless misconduct alleged in their Complaint and that would effectively deter Defendants from future discriminatory behavior;

5. Award Plaintiffs their attorneys' fees and costs incurred;

6. Appoint a jury to try the facts of this case; and

7. Order such other and further relief as this Court deems just and proper.

Respectfully Submitted,

s/ *Alan G. Crone*

Alan G. Crone, (TN Bar No. 014285)
The Crone Law Firm, PLC
88 Union Avenue, 13th Floor
Memphis, TN 38103
901.737.7740(voice)
901.474.7926 (facsimile)
acrone@cronelawfirmplc.com

*Attorney for Plaintiffs*